[987 NE2d 244, 964 NYS2d 467]

Paula White, Individually and as Executrix of the Estate of Leonard White, Respondent, v Dennis Farrell et al., Appellants.

Argued February 12, 2013; decided March 21, 2013

**POINTS OF COUNSEL**

*Milford, Lynch & Shannon*, Syracuse (*John A. Cirando, Bradley E. Keem* and *Elizabeth deV. Moeller* of counsel), for appellants. The sellers are entitled to actual and consequential damages. (*Merritt Hill Vineyards v Windy Hgts. Vineyard*, 94 AD2d 947; *Weiss v Karch*, 62 NY2d 849; *Todd v Gamble*, 148 NY 382; *Matter of John P. Burke Apts. v Swan*, 137 AD2d 321; *Matter of Estate of Taylor v State of New York*, 39 AD2d 984; *City of Yonkers v State of New York*, 49 AD2d 647; *Di Scipio v Sullivan*, 30 AD3d 677; *Ashton v McLenithan*, 224 AD2d 749; *Tesmer Bldrs. v Cimato*, 217 AD2d 953; *Ryan v Corbett*, 52 AD3d 1270.)

*Mackenzie Hughes LLP*, Syracuse (*W. Bradley Hunt* of

counsel), for respondent. I. The Supreme Court and the Fourth Department correctly ruled that the sellers sustained no actual damages. (*Astoria Caterers, Inc. v J&P 1870 Realty Corp.*, 24 AD3d 478; *Ryan v Corbett*, 52 AD3d 1270; *Matzkowitz v Prince*, 195 AD2d 842; *Hayden v Pinchot*, 172 App Div 102; *Brushton-Moira Cent. School Dist. v Thomas Assoc.*, 91 NY2d 256; *Procopis v G. P. P. Rests.*, 43 AD2d 974; *Di Scipio v Sullivan*, 30 AD3d 677; *Ashton v McLenithan*, 224 AD2d 749; *Tesmer Bldrs. v Cimato*, 217 AD2d 953; *Abdella v Foley*, 75 AD2d 983.) II. The Supreme Court correctly ruled that the sellers are not entitled to recover consequential damages—a ruling that the sellers did not appeal to the Fourth Department. (*Clifford R. Gray, Inc. v City School Dist. of Albany*, 277 AD2d 843; *City of Mount Vernon v Mount Vernon Hous. Auth.*, 235 AD2d 516; *Matter of Seitelman v Lavine*, 36 NY2d 165; *Tator v Salem*, 81 AD2d 727; *Di Scipio v Sullivan*, 30 AD3d 677; *Czarnikow-Rionda Co. v Federal Sugar Ref. Co.*, 255 NY 33.) III. In the alternative, if this Court determines that the lower courts erred in ruling as a matter of law that the sellers are not entitled to damages, this Court should remand this case to the Supreme Court for a determination of the amount—if any—of damages.

## OPINION OF THE COURT

READ, J.

We are called upon in this appeal to decide the measure of a seller's damages for a buyer's breach of a contract to sell real property. We hold that the measure of damages is the difference, if any, between the contract price and the fair market value of the property at the time of the breach. The price obtained by the seller on a later resale of the property may well bear on damages, depending upon the circumstances. As matters stand in this case, there is conflicting evidence as to the property's fair market value when the buyer defaulted, an issue of fact, which precludes summary judgment.

I

In May 2004, defendants Dennis and Nancy Farrell decided to sell their lakeside property in Skaneateles, New York. The Farrells originally purchased this land in October 2002 and razed the existing structures—a seasonal home, guest cottages and a garage—to build themselves a new single-family, year-round residence as a second home. They resided in New Jersey at the time, but by 2004 the Farrells were considering moving to South

Carolina. Because of construction delays, the house in Ska-neateles was not completed until March or April 2005; a certificate of occupancy was issued on May 31, 2005, a year after the Farrells first listed the property for sale.

On June 12, 2005, the Farrells' real estate agent, Linda Roche, showed the property to plaintiff Paula White and her now-deceased husband, Leonard. That same day, the Whites signed a contract to buy the property for $1.725 million, the Farrells' asking price, and tendered a $25,000 deposit. The $1.7 million balance was to be paid in cash at a closing to be held "on or about July 10, 2005." The contract, which did not state that time was of the essence, was contingent on a satisfactory home inspection; resolution of a number of construction-related items, including one identified as "drainage finished"; and attorney approval. The Farrells executed the contract on June 13, 2005.

At the time the parties reached this agreement, a drainage system intended to divert surface water away from the house was apparently still under construction on the north side of the property, and the leach field for the raised bed septic system was soggy. On June 15, 2005, Mr. Farrell wrote Ms. Roche to advise that "[i]n response to our buyer [i.e., Mr. White] and his concerns" he was prepared to "fix or credit him to make [the] house as close to what he wants as possible." He mentioned one project that would take five or six weeks to complete, and identified the steps then being taken to correct "[t]he water between the garage and [the] house" and "[t]he water in front of the garage." Mr. Farrell added that he lived too far away to hire or monitor contractors, and so would agree to reduce the contract price by $10,000 to cover other items that Mr. White might "choose[ ] to change or modify like bench tops, locks, painting[,] new front lawn[,] etc." Ms. Roche conveyed this information to the Whites' real estate agent; retained a plumber and septic system expert to investigate and remedy water and drainage problems; and kept the Whites' real estate agent closely apprised of progress.

The house inspection was conducted on June 18, 2005. On June 22, 2005, the Whites' attorney approved the contract, subject to proof of real estate taxes being $30,000 or less, and the parties executed a contract addendum. By the addendum, the Whites removed all contingencies in exchange for the Farrells' promise to complete several enumerated tasks, including finishing the drainage system on the north and south sides of the house, and to provide the $10,000 credit. According to Mr.

Farrell, while "it was known" when the addendum was signed "that a portion of the property was wet and/or having drainage issues," the cause of the dampness, which he claimed was not present when he and his wife signed the property condition disclosure statement in May 2004 (see Real Property Law § 462), had yet to be figured out. The addendum did not set any time frame or deadline for completion of the work the Farrells committed to accomplish.

Two weeks later, by letter dated July 7, 2005, the Whites' attorney notified the Farrells' attorney that his clients had "elected to terminate the contract [because] upon closer inspection . . . the drainage situation [might] never be rectified." He indicated they reached this conclusion after Mr. White toured the site that day with his construction consultant. The Farrells' attorney responded by letter dated July 8, 2005, essentially taking the position that the Whites were well-aware when they signed the contract that additional measures needed to be implemented to fix the septic system and deal with surface water runoff. He outlined what had been done to date, and observed that Mr. Farrell considered one of the issues now raised by the Whites—the supposed necessity for a retaining wall— "nothing more than a fabricated reason to cancel the contract." He closed by saying that Mr. Farrell would be "more than willing" to meet with Mr. White on the premises to review the work completed and address his concerns, but that "[i]f [Mr. White was] unwilling to discuss the 'alleged issues' in a good faith manner, then we will have no alternative but to relist the property for sale and hold your clients responsible for the damages which might result." On July 13, 2005, the Whites' attorney responded that Mr. White had "no intentions of going forward with the contract," and was "extremely upset that the drainage problem was never disclosed, and in fact [the property condition disclosure statement] affirmatively denie[d] any drainage problem" existed.

On October 4, 2005, the Farrells' attorney sent a time-is-of-the-essence letter to the Whites' attorney, stating that Mr. Farrell had "resolved all issues" regarding required septic modifications on his property; declaring the place, time and date (Oct. 24, 2005) of closing; and enclosing the relevant closing documents. The Whites neither responded to this letter nor showed up at the closing. On July 23, 2005, they had signed a contract of purchase and sale for another piece of property on Skaneateles Lake. The Whites closed on this property, for which they paid $1.7 million, on August 24, 2005.

On June 6, 2006, the Whites sued the Farrells to recover their $25,000 down payment, alleging fraudulent inducement, negligent misrepresentation and that the Farrells were not ready, willing and able to close as of the declared closing date in October 2005. In particular, the Whites claimed that they made the offer to purchase and tendered the earnest money in reliance on the Farrells' representation in the property condition disclosure report, attached to the contract, that there were no flooding, drainage or grading problems resulting in standing water on the property. On July 31, 2006, the Farrells answered and counterclaimed for damages for breach of contract.

During discovery, the Farrells' real estate agent, Ms. Roche, was deposed by the Whites' attorney. She testified that she had worked as a broker in the Skaneateles area since 1980; that she would generally be considered an expert regarding the value of properties around the lake; and that real estate appraisers and bankers looked to her when they wanted an accurate estimate of value in the Skaneateles real estate market. When asked a series of questions about fair market value, Ms. Roche opined that $1.725 million was the fair market value of the Farrells' property in May 2004 (when it was first listed), June 2005 (when the contract was signed), July 2005 (when the Whites repudiated the contract), and October 2005 (the date set for conveying title). She added that $1.725 million was also the fair market value of the Farrells' property in the spring and summer of 2006 "because everything still was selling at . . . 1.5 to 3 million in 2006 . . . We were still in a very heated market." Ms. Roche acknowledged that the only offer the Farrells ever received in the $1.725 million "range" was from the Whites. On January 11, 2007, while this lawsuit was pending, the Farrells accepted a purchase offer of $1,376,550 from a third party, to whom they conveyed the property on March 9, 2007.

On December 14, 2009, the Farrells moved for summary judgment to dismiss the Whites' complaint and award them damages on their counterclaim. They sought $348,450 in actual damages (the difference between the original contract price of $1.725 million agreed to by the Whites and the eventual sale price of $1,376,550), and consequential damages of $217,636.88 (apparently, the sum of mortgage and tax payments made on the property from July 7, 2005 until the closing with the ultimate purchaser on March 9, 2007). The Whites opposed the Farrells' motion and cross-moved for summary judgment to dismiss the counterclaim and compel the Farrells to return the $25,000 deposit.

On February 9, 2010, Supreme Court handed down a bench decision disposing of the parties' motions. The judge concluded that the Whites had breached the contract, and so were not entitled to return of their $25,000 down payment. He adopted as the measure of the Farrells' actual damages the standard stated in *Webster v Di Trapano* (114 AD2d 698, 699 [3d Dept 1985])—i.e., "the difference between the contract price and the market value of the real property at the time of the breach." The judge then reasoned that, in view of Ms. Roche's deposition testimony that the property's "market value at the time of the breach was, in fact, the same as the contract price," the buyers (the Whites) had established that the sellers (the Farrells) did not suffer any actual damages on account of the buyers' breach. Additionally, he ruled that the Farrells' claim for consequential damages was "not valid." The Farrells appealed from so much of Supreme Court's subsequent order, entered on June 9, 2010, as determined that they suffered no actual damages; the Whites did not cross-appeal. The Appellate Division unanimously affirmed the order, insofar as appealed from, without opinion (87 AD3d 1309 [4th Dept 2011]). We subsequently granted the Farrells leave to appeal (18 NY3d 809 [2012]).[1]

## II

The Farrells argue that Supreme Court should have measured damages by applying a principle articulated by the Third Department in *Di Scipio v Sullivan* (30 AD3d 660 [3d Dept 2006]). In that case, the buyer in a real estate transaction died suddenly several days before the scheduled closing. Following the appointment of an administrator for the buyer's estate, the seller declared time to be of the essence and scheduled two closing dates. When the administrator failed to close, the seller brought an action for breach of contract. Supreme Court granted, and the Third Department affirmed, an order determining that the administrator breached the contract, which entitled the seller to retain the 10% down payment of $99,900 as damages.

The seller then sought an inquest, claiming that he had suffered further actual or consequential damages. After the

---

1. We agree with the Whites that any question of whether, or to what extent, the Farrells were entitled to recover consequential damages is not properly before us (*see Clifford R. Gray, Inc. v City School Dist. of Albany*, 277 AD2d 843, 846-847 [3d Dept 2000]; *City of Mount Vernon v Mount Vernon Hous. Auth.*, 235 AD2d 516, 516-517 [2d Dept 1997]).

inquest, Supreme Court ruled that the seller had not proven any additional damages by a preponderance of the evidence. The seller then appealed, claiming that he had shown further damages consisting of a real estate broker's commission owed and real estate taxes, mortgage interest, maintenance expenses and utilities paid. The Third Department disagreed, stating in dictum that

> "the measure of damages incurred as a result of a breach of a real estate contract is *either* the difference between the contract price and a subsequent lower sale price *or*, where no subsequent sale has occurred, the difference between the contract price and the market value of the real property at the time of breach. Here, [the seller] spurns the commonly accepted measure of damages and, instead, seeks recovery for the aforementioned items," which the court considered to be unrecoverable consequential damages or expenses not proximately caused by the buyer's breach (*see Di Scipio v Sullivan*, 30 AD3d 677, 677-678 [3d Dept 2006] [emphasis added and citations omitted]).

The Farrells take *Di Scipio* to mean that the measure of a seller's actual damages for a buyer's breach of a contract to sell realty is always the difference between the contract price and any later lower selling price, and ask us to adopt this as the rule of decision. The majority of jurisdictions, however, adhere to a different standard, succinctly explained in Williston on Contracts as follows:

> "Unless the vendor has elected to accept, as the exclusive remedy, liquidated damages represented by the purchaser's deposit, where the vendor sues the purchaser for breach of contract, the vendor may recover for the loss of the bargain, and *the generally accepted measure of damages is the difference between the contract price and the fair market value of the property at the time of the breach*. The vendor may recover damages in the amount of the contract price reduced by the fair market value of the property, less any deposit or earnest money paid by the purchaser. . . . *The price obtained by the vendor on a later resale of the property may be regarded as competent evidence of its fair market value on the date of the purchaser's breach, provided that the*

*market conditions are similar and the time elapsed between the date of the breach and the date of the resale is not too great"* (13 Lord, Williston on Contracts § 66:80 [4th ed] [emphasis added]; *see also* 14 Powell on Real Property § 81.04 [2] [b] at 81-183 [Michael Allan Wolf ed, LexisNexis Matthew Bender 2000] [where the buyer breaches a contract for the sale of real property, "(t)he damage award is set by determining the difference between the contract price and the property's market value at the time of breach"]; Korngold, *Seller's Damages from a Defaulting Buyer of Realty: The Influence of the Uniform Land Transactions Act on the Courts,* 20 Nova L Rev 1069, 1073 [1995-1996] [collecting cases and noting that "(c)ourts typically declare that the measure of a seller's damages for a buyer's failure to perform under a contract of sale for realty is the difference between the contract price and the market value of the property on the date of the breach"]; Calamari & Perillo's Hornbook on Contracts § 14.30 [6th ed 2009] ["If the vendee breaches, it seems to be the rule everywhere that the vendor may recover standard contract damages: the difference between the unpaid contract price and the market value of the real property at the time of the breach"]).

We have never before considered the measure of damages for a buyer's breach of a contract to sell real property. The four departments of the Appellate Division, however, have consistently endorsed the time-of-the-breach rule, although there are certainly cases where the standard used is not stated, or it is not made clear that the resale price is simply evidence of the property's fair market value at the time of the breach.

In *Hayden v Pinchot* (172 App Div 102 [1st Dept 1916]), there was conflicting proof at trial of the property's market value at the time the buyer broke the contract of purchase and sale. The First Department affirmed the trial judge's finding as to fair market value, concluding that it was not against the weight of the evidence. In so doing, the court observed that "[t]he rule seems to be well settled that the measure of damages for the breach of a contract by the vendee is the difference between the contract price and the market value of the property at the time of the breach" (*id.* at 105).

The Second Department in *Cohen v Kranz* (15 AD2d 938 [2d Dept 1962], *affd* 12 NY2d 242 [1963]) did not state the rule applied to affirm a trial judge's award of damages amounting to the difference between the contract and resale prices, less the buyer's down payment. On appeal, we addressed other issues presented by the case. With respect to the measure of damages, we observed only that the sellers "obtained an affirmative recovery on their counterclaim for breach of contract based on the loss they sustained when they sold the house to a third person for what the courts below found to be its fair market value" (*id.* at 247).

The seller in *Procopis v G. P. P. Rests.* (43 AD2d 974 [2d Dept 1974]) sought as damages the difference between the contract price and the property's fair market value at the time of the buyer's breach, which he argued was the resale price. The judge, after a nonjury trial, agreed and awarded damages in the amount asked for. The Second Department reversed, reasoning that "although the subsequent sale [was] some evidence of the fair market value of the property at the time of the breach, standing alone it [was] insufficient proof . . . upon which to predicate [sellers'] damages," especially since the terms of the resale were "substantially different . . . from those contained in the contract sued upon" (*id.* at 975-976).

In *Colonial Diversified v Assured Holding Corp.* (71 AD2d 1011 [2d Dept 1979]), the judge, after a nonjury trial, dismissed the seller's counterclaim for damages for breach of contract and directed return of the buyer's down payment. The Second Department reversed, holding that "it [was] apparent that the [buyer] was the defaulting party, and as a result [was] barred from recovering its down payment, as well as remaining liable for damages sustained by the [sellers] by virtue of its default" (*id.* at 1012 [citations omitted]). The court noted that at trial the sellers presented expert testimony to show that the market value of the property at the time of the buyer's breach was $32,000, and also proved they were only able to resell the property for that amount. Accordingly, the Second Department ruled that the sellers were entitled to recover the difference between $32,000 and the contract price, less the down payment already in their possession.

In addition to *Di Scipio*, the Third Department has in relatively recent years considered four other appeals in cases where the trial judge, after a nonjury trial, assessed damages for a buyer's breach of a contract to sell realty. In *Tator v Salem*

(81 AD2d 727, 728 [3d Dept 1981]), the Third Department affirmed an award of $10,000 in "direct damages," which was the difference between the original contract price and the eventual sale price. The decision is silent as to the standard applied.

In *Webster*, the case relied upon by Supreme Court to support the bench decision and order here, the trial judge computed damages for the buyer's breach by subtracting the real property's eventual sale price from the contract price. Citing the First Department's decision in *Hayden*, the Third Department "[found] merit in [the sellers'] argument that the proper measure of damages is the difference between the contract price and the market value of the real property at the time of breach" (*Webster*, 114 AD2d at 699). Since the trial judge "expressly found" that the property's market value at the time of the breach was higher than the resale price, and this higher figure was supported by the evidence, the court concluded that calculation of damages using the resale price was "inappropriate," and remitted for purposes of recalculation. (*Id.*)

The Third Department in *Matzkowitz v Prince* (195 AD2d 842 [3d Dept 1993], *lv denied* 83 NY2d 751 [1994]) recast somewhat the rule stated in *Webster*. There, the seller contended that the trial judge had erred by calculating damages using the price for which the property was sold some 11 months after the breach. The court stated that "[o]rdinarily, '[sellers] are entitled to the difference between the price established in their contract with [buyers] and the amount ultimately received for the [real] property' *unless there is evidence that the fair market value at the time of the breach is otherwise*" (*Matzkowitz*, 195 AD2d at 842, quoting *Binks v Farooq*, 178 AD2d 999, 1001 [4th Dept 1991], *lv denied* 80 NY2d 752 [1992], discussed later, and citing *Tator*, *Cohen*, and *Webster*, discussed earlier [emphasis added]). And "[w]hile . . . [the buyer] offered expert testimony of market value at the time of the breach in excess of the amount ultimately received, [the sellers'] expert offered contrary opinion evidence which created a credibility issue for determination by the trial court" that the Third Department was "loath to disturb" (*id.*).

In *Ashton v McLenithan* (224 AD2d 749 [3d Dept 1996]), the sellers commenced an action alleging fraud and breach of contract for the sale of a parcel of land. The parties reached a settlement agreement in open court whereby the sellers agreed to sell the parcel with a newly constructed home to the buyers for $300,000. The buyers failed to perform in accordance with

this agreement, and the sellers sought judgment for the agreed-upon amount. At the subsequent nonjury trial held to determine the sellers' damages "as the difference in value of the settlement amount and the actual value of the house at the time of the breach," both parties submitted expert evidence on this issue (*id.* at 749). The trial judge found the value of the property to be $214,000 "based upon the assessments of value offered by both experts," and "determined damages to be the difference between the settlement price and the value at the time of the breach" (*id.* at 750-751). The Appellate Division concluded there was "sufficient evidence for Supreme Court to have made its assessment within the range of values given" (*id.* at 751). This property was apparently not resold while the lawsuit was pending.

The Fourth Department in *Binks*, reversing the trial court, ruled that the buyers had breached their contract to purchase the sellers' apartment complex. Stating that the sellers were "entitled to the difference between the price established in their contract with [the buyers] and the amount ultimately received for the property," the court awarded the sellers this amount, which was "uncontroverted," less the buyers' down payment, ordered to be released from escrow to the sellers (178 AD2d at 1001). In support of its ruling, the Fourth Department cited our decision in *Tague Holding Corp. v Harris* (250 NY 422 [1929] [the seller was awarded profits lost when the buyer defaulted on an installment contract for the purchase of land that the seller had contracted to buy from a third party]), which deals with consequential damages, *Tator* and *Cohen.*

In *Tesmer Bldrs. v Cimato* (217 AD2d 953 [4th Dept 1995]), the trial court awarded the buyer summary judgment on its claim to recover a down payment. The Fourth Department reversed, holding that the buyer's unilateral rescission of the contract for the sale of real property constituted an anticipatory breach, entitling the sellers to retain the down payment. The court endorsed a judgment in favor of the sellers representing the difference between the contract price and the resale price, while observing that the buyer had "not controverted the claim of damages asserted by the seller" (*id.* at 954).

The Fourth Department in *Ryan v Corbett* (52 AD3d 1270 [4th Dept 2008]) agreed with the buyer that the trial court had erred by relying on *Di Scipio* when assessing the amount of the sellers' damages caused by the buyer's breach of the parties' contract of purchase and sale. In sum, "[b]ecause there was a

subsequent sale of the [sellers'] residence, the court in reliance on *Di Scipio* did not consider evidence of the market value of the property at the time of the breach, and it awarded [the sellers] the difference between the contract price and the price received upon the subsequent sale of the property" (*id.* at 1270). Instead, the Fourth Department agreed with the Third Department's decisions in *Matzkowitz* and *Webster*. But although "agree[ing] with [the seller] that the [trial judge] erred in failing to consider the testimony of her expert appraiser with respect to the fair market value at the time of the breach," the court "nevertheless conclude[d], upon [its] independent review of the record, that the expert's testimony did not establish 'that the fair market value at the time of the breach [was] otherwise[;]' i.e., it did not outweigh the evidence of value established by the subsequent sale of the property" (*id.* at 1271 [citation omitted], quoting *Matzkowitz*, 195 AD2d at 842).

## III

■ We reject the Farrells' invitation to put aside settled law and adopt a new rule whereby a seller's damages for a buyer's breach of a contract to sell real property is the difference between the contract price and the resale price (assuming, of course, the property is resold in an arm's length transaction sometime before the conclusion of the lawsuit for breach of contract). The time-of-the-breach rule is longstanding in New York, as illustrated by the preceding Cook's tour of appellate decisions from throughout the State and as early as 1916; "seems to be the rule everywhere" in the United States (*see* Calamari & Perillo, *supra* at 495); and is consistent with the general contract principles that damages "are properly ascertained as of the date of the breach," and "the injured party has a duty to mitigate" (*see Brushton-Moira Cent. School Dist. v Thomas Assoc.*, 91 NY2d 256, 262-263 [1998] [measuring damages for breach of a construction contract from the date of the breach rather than from the date of the damages trial held 13 years later]). This is not to say that resale price is irrelevant to the determination of damages; in fact, the resale price, in a particular case, may be very strong evidence of fair market value at the time of the breach. This is especially true where the time interval between default and resale is not too long, market conditions remain substantially similar, and the contract terms are comparable (*cf. e.g. Procopis*, discussed earlier).

In the view of the concurring judges, the "better rule" for calculating a seller's damages when a buyer breaches a contract

to sell real property "is found in the Uniform Land Transactions Act" (ULTA) (*see* concurring op at 502). The relevant provision states that the wronged seller "may resell the real estate . . . and recover any amount by which the unpaid contract price . . . exceeds the resale price, less expenses avoided because of the buyer's breach" (ULTA [1975] § 2-504 [a]). Initially approved by the National Conference of Commissioners on Uniform State Laws (the National Conference) in 1975 and intended to be the Uniform Commercial Code of real estate law, ULTA was something of a flop. It was never adopted by any state, and was withdrawn by the National Conference in 1990 (*see* Brown, *Whatever Happened to the Uniform Land Transactions Act?*, 20 Nova L Rev 1017, 1018 [1996]). Further, ULTA's measure-of-damages rule for a buyer's breach appears to have been adopted judicially by only a single intermediate appellate court some 20 years ago (*see Kuhn v Spatial Design, Inc.*, 245 NJ Super 378, 585 A2d 967 [Super Ct, App Div 1991] [where the buyer breaches a contract to purchase real estate, the seller may recover the difference between the contract price and the resale price and any incidental and consequential damages, less expenses avoided as a result of the breach]). This is not surprising, as the ULTA rule is not conspicuously fairer or easier to apply than the time-of-the-breach rule. And as we noted in *Maxton Bldrs. v Lo Galbo* (68 NY2d 373 [1986]), where we reaffirmed a seller's right to retain the down payment when the buyer in a real estate transaction wrongly fails to perform,[2] adherence to tradition is

> "particularly apt in cases involving the legal effect of contractual relations. In fact, when contractual rights are at issue, 'where it can reasonably be assumed that settled rules are necessary and necessarily relied upon, stability and adherence to precedent are generally more important than a better or even a "correct" rule of law' " (*id.* at 381, quoting

---

**2.** In *Maxton,* the defaulting buyer failed to persuade us to replace our traditional rule with a "modern rule" permitting recovery for part performance in excess of the seller's actual damages, with the burden on the buyer to prove the net benefit conferred (68 NY2d at 379-380). Because in New York it is "axiomatic [that] a 'vendee who defaults on a real estate contract without lawful excuse[ ] cannot recover the down payment' " (*see Cipriano v Glen Cove Lodge #1458, B.P.O.E.*, 1 NY3d 53, 62 [2003], quoting *Maxton*, 68 NY2d at 378), it may well be that, in most instances where the buyer breaches a contract to sell real estate, the seller simply retains the down payment without resorting to the expense and uncertainty of litigating actual harm.

*Matter of Eckart*, 39 NY2d 493, 500 [1976]; *see also People v Damiano*, 87 NY2d 477, 488, 489 [1996, Simons, J., concurring] ["common-law decisions should stand as precedents for guidance in cases arising in the future" for substantial reasons of stability and legitimacy, subject to "reexamination if there is some evidence that the policy concerns underlying them are outdated or if (existing rules) have proved unworkable"]).

## IV

■ Here, the Farrells contend that Ms. Roche's opinion as to the value of their property on the date of the breach (which is October 24, 2005, given the facts) is not entitled to any weight; contrariwise, the Whites maintain that Ms. Roche's opinion is conclusive as a matter of law, which is how Supreme Court seems to have treated it. Ms. Roche's deposition testimony does not lack factual support, as the Farrells protest: she is an experienced broker in the Skaneateles area; she explained the factors she considered to come up with $1.725 million as the property's listing price and fair market value, including what the Farrells paid for the property in 2002 (she was the seller's broker at the time), the cost of the improvements they subsequently made, and the size and lake frontage of other properties selling in the $1.5 to $3 million range in 2005 and 2006 (although she did not describe or discuss the property the Whites actually bought for $1.7 million in August 2005). But fair market value is a question of fact, and in this case there was evidence contradicting Ms. Roche's testimony, including the property's substantially lower eventual sale price. As a result, neither party was entitled to the summary judgment both sought and the Whites successfully secured in Supreme Court. Notably, in the Appellate Division decisions discussed earlier the trial judges determined damages only *after* a trial or inquest. On remittal, the judge in this case will need to consider at least the following factors relevant to damages: whether, or the degree to which, the property's resale in January 2007 for $1,376,550 reflects fair market value as of October 2005, given the lapse of time (about 14 months) and any differences in market conditions and contract terms; whether the Farrells made sufficient efforts to mitigate (i.e., to resell at a reasonable price after the Whites' default), which is relevant to any weight to be given the resale price as a measure of fair market value at the time of the

breach; and the cost to remedy the property's drainage deficiencies, which, like the cost to complete several other specified tasks and the $10,000 credit—all agreed to by the parties in the contract addendum—should be subtracted from $1.725 million (the original contract price) in order to establish the contract price to be compared to the property's fair market value in October 2005.[3]

Accordingly, the order of the Appellate Division should be modified, without costs, by remitting to Supreme Court for further proceedings in accordance with this opinion, and, as so modified, affirmed.

PIGOTT, J. (concurring). I concur in the result reached by the majority, but I disagree with its rationale because, in my view, the majority is blurring an important distinction between the measure of damages for breach of real estate contracts and the measure of damages in other sales.

Real property is and has always been treated differently from other sales, mainly because real property, by its very nature, is unique (see 1-3 Warren's Weed, New York Real Property § 3.01 [1] [f]). There is no dispute here that the buyers breached the contract. The sellers should therefore recover the benefit of their bargain from the buyers. In this case, that may very well be $348,450, the difference between the contract price and the subsequent sale price, subject, of course, to any evidence proffered by the buyers that the sellers failed to act with due diligence to mitigate their claimed loss. Any other measure is a fiction. To flatly suggest, as the majority does, that the measure should be "fair market value" at the time of the breach would almost always mean the actual contract price, for the simple reason that a willing seller and willing buyer had established that price at arm's length. The end result is that a seller will rarely be damaged by a purchaser's breach for any reason.

Under the majority's rule, it is the innocent sellers, and not the breaching buyers, who must bear the cost of the buyers' breach. In my view, the better rule is found in the Uniform Land Transactions Act:

> "If a buyer wrongfully rejects, or otherwise commits
> a material breach, or repudiates as to a substantial
> part of the contract . . . , the seller may resell the

---

**3.** Any damages awarded would, of course, be less the $25,000 down payment.

real estate . . . and recover any amount by which the unpaid contract price . . . exceeds the resale price, less expenses avoided because of the buyer's breach" (Uniform Land Transactions Act [ULTA] [1975] § 2-504 [a]).[1]

Not only does this rule recognize the unique character of real estate transactions and provide some certainty for the non-breaching seller, it also places the risk where it properly belongs, i.e. on the breaching buyer. This rule is not one-sided, affording protection to the breaching buyer should the seller be fortunate enough to resell the property at the same or a higher price (*see* ULTA § 2-504 [f] [stating that the seller will not be "accountable to the buyer for any profit made on any resale"]).

The nonbreaching sellers are entitled to the benefit of their bargain, and that benefit should not be denied by the application of a rule that fails to take that basic tenet into account. The cases cited by the majority in support of the "time-of-the-breach" rule appear to apply the rule by rote (majority op at 495-499), detached from the reality of realty by failing to consider the legal consequence of an axiom that is harmful to the nonbreaching party.

The majority ultimately supports its adoption of the "time-of-the-breach" rule—which is common in contract law and in the Uniform Commercial Code[2] where the parties are dealing in common activities or fungible goods—by relying primarily on a case involving a school district's cause of action seeking the cost of replacing or repairing defective window panels that had been installed in its building (*see Brushton-Moira Cent. School Dist. v Thomas Assoc.*, 91 NY2d 256 [1998]). There, the Court, applying general, black letter law, stated that "damages for breach of contract are ordinarily ascertained as of the date of the breach" (*id.* at 261 [citations omitted]).

But real property, unlike window panels, is not fungible. While there are usually extensive and active markets for fungible goods, thereby making it relatively less difficult for the seller to mitigate or cover in the event of a breach, the sale of real estate is clearly different because each parcel is unique (*see Alba v Kaufmann*, 27 AD3d 816, 818 [3d Dept 2006]; *EMF Gen. Contr. Corp. v Bisbee*, 6 AD3d 45 [1st Dept 2004], *lv denied* 3 NY3d

---

**1.** Although this provision also states that a buyer may also recover incidental and consequential damages, whether or not the sellers here are entitled to such damages is not before us.

**2.** Uniform Commercial Code § 2-725.

607 [2004]). As a result, the pool of buyers is plainly smaller for real estate than goods, and when a buyer breaches a real estate purchase agreement, the seller must then commence the sale process anew, which may require a reassessment of the list price and more showings of the property to new buyers, who may or may not find the property's location, amenities or architectural style desirable. This may take a substantial amount of time and effort on the seller's part, and the seller's efforts may not readily succeed, because once the house has been on the market for a significant period of time, the market may have declined or prospective purchasers may be wary of the amount of time the house has been on the market, leading them to conclude that the property is tainted in some fashion. Meanwhile, under our holding today, the breaching buyer will walk away indifferent to the hardship caused to the seller by his conduct.

The majority agrees that "the resale price, in a particular case, may be very strong evidence of fair market value at the time of the breach," especially if "the time interval between default and resale is *not too long*, market conditions remain substantially similar, and the contract terms are comparable" (majority op at 499 [emphasis added]). There is no dispute that the general rule is that damages are measured by the fair market value at the time of the breach; the issue here is whether that measure, in cases where the property is later sold with reasonable diligence and in good faith, is adequate or even realistic. In such a circumstance, why should the nonbreaching seller suffer the consequences of the buyer's breach? If market conditions decline, shouldn't the loss be laid squarely at the feet of the breaching buyer, particularly where the seller is able to make a colorable claim at trial in that regard?

The majority also holds that the trial court in this case will need to consider, among other things, whether the sellers "made sufficient efforts to mitigate" (majority op at 501), but mitigation is irrelevant under the majority's rule since the only calculation that matters is the difference between the fair market value at the time of the breach and the contract price. Under the ULTA rule proposed by this concurrence, the seller's mitigation is very relevant, and would constitute a valid defense by a breaching purchaser on the issue of damages once the nonbreaching seller has made a prima facie case for breach of contract and entitlement to damages. Applying that rule here, there is a question of fact as to whether the sellers mitigated their damages subsequent to the buyers' breach and whether

the sale in March 2007 for $1,376,550 represented the fair market value of the property.

Although the majority correctly concludes that there are questions of fact, it is my view that the trial court should follow the above rule in assessing the true nature of the damages incurred by the sellers.

Chief Judge LIPPMAN and Judges GRAFFEO and RIVERA concur with Judge READ; Judge PIGOTT concurs in the result in an opinion in which Judge SMITH concurs.

Order modified, without costs, by remitting to Supreme Court, Onondaga County, for further proceedings in accordance with the opinion herein, and, as so modified, affirmed.