# IN THE SUPREME COURT OF TEXAS

No. 18-0403

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH AND
CREDIT SUISSE SECURITIES (USA) LLC, PETITIONERS,

v.

CLAYMORE HOLDINGS, LLC, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

**Argued January 8, 2020**

JUSTICE BLACKLOCK delivered the opinion of the Court.

This case arises from the inflated appraisal of a residential real estate project near Las Vegas in 2007, shortly before the notorious housing bubble popped. Highland Capital Management[1] loaned the project $250 million. Together with other lenders, Highland took the real estate as collateral. The lenders ended up losing nearly all their investment after the borrower defaulted and the collateral's value plummeted. Highland, aka Claymore Holdings, sued Credit

---

[1] The loans at issue were made by several separate funds managed by Highland Capital Management, L.P. According to the petitioners, Highland Capital Management created Claymore Holdings, LLC ("Claymore") "for the sole purpose of pursuing claims against Credit Suisse in this litigation." The funds assigned the claims asserted in this suit to Claymore. Both Claymore and the court of appeals referred to Claymore and its assignors collectively as "Claymore." For convenience, this opinion will do the same.

Suisse, which helped arrange the transaction and participated in it as an intermediary. The suit sought recovery of Claymore's investment losses under various legal theories. The suit alleged Credit Suisse fraudulently inflated the appraisal of the real estate, inducing Claymore to make a loan it would not otherwise have made. It also alleged the faulty appraisal amounted to a breach of contract by Credit Suisse, among other claims. By the parties' agreement, the case is governed by New York law.

The fraudulent inducement claim was tried to a Texas jury. The jury found for Claymore. It was asked to award, as damages for Claymore's injury, "[t]he difference, if any, between what Plaintiff paid and the value of what Plaintiff received in the 2007 Lake Las Vegas Refinancing." Claymore argued this number was $172 million. The jury awarded $40 million. The contract claim was tried to the court. The court found Credit Suisse liable for breach of contract and liable under several other theories. The court concluded that Claymore's damages on these claims and on the fraudulent inducement claim already tried to the jury could not be calculated with reasonable certainty. On that basis, it awarded Claymore $211 million in equitable relief, effectively a recoupment of its investment losses. On appeal to this Court, Credit Suisse contests its liability on all claims and challenges the trial court's award of equitable relief.

For the reasons explained below, the jury's $40 million fraud verdict must stand, but the trial court's award of $211 million in equitable relief must not. One principle linking those two conclusions is the primacy of a jury verdict. Under New York law, the jury's verdict adequately supports Credit Suisse's liability for fraud, despite the contractual disclaimers of reliance urged by Credit Suisse. On the other hand, the jury's award of $40 million in damages for Claymore's injury—after Claymore put on an extensive damages case for the jury—undermines the trial

2

court's conclusion that there was no way to reasonably calculate the damages the faulty appraisal inflicted on Claymore. Equitable relief on any of Claymore's claims was available only if conventional legal damages for its injury could not be calculated. We hardly need ask whether Claymore's damages attributable to the faulty appraisal *could* be calculated, because they *were* calculated by Claymore itself, which asked the jury for $172 million in damages based on the testimony of multiple industry experts. The jury disagreed with that number. It awarded $40 million, and Claymore does not challenge that amount. The trial court then awarded over five times the jury's award, under the banner of equitable relief, for essentially the same injury to Claymore that the jury had already valued at $40 million.

Claymore unquestionably got something of substantial value in exchange for the money it loaned. Because of the faulty appraisal, what Claymore got for its money was not as valuable as what it thought it was getting. But it got something of value nonetheless. The borrower's default and the collapse of the real estate market later reduced the value of what Claymore held. But those events were driven by forces beyond either party's control, not by the faulty appraisal. The trial court's award, however, inequitably treated Claymore as though it received nothing at all in the transaction. Rather than approximate the portion of Claymore's losses attributable to the faulty appraisal, the award charged all Claymore's investment losses to Credit Suisse. We find no valid basis in New York law for this large award of equitable monetary relief, particularly given the jury's prior finding that a much smaller sum "fairly and reasonably compensated" Claymore for losses attributable to the faulty appraisal.

The court of appeals' judgment is affirmed in part and reversed in part, and the case is remanded to the trial court for entry of judgment consistent with this opinion.

3

## I. Background

### A. Factual Background

Highland Capital Management, L.P. (aka "Claymore") loaned $250 million to a Henderson, Nevada residential real estate development in 2007. Claymore and other lenders provided a total of $540 million in loans to refinance the struggling development. Claymore often invested in distressed, high-risk projects. It packaged those investments into funds sold to investors.

The multi-party refinancing was covered by several agreements, including a lengthy Credit Agreement. Credit Suisse AG, Cayman Islands Branch,[2] was involved in the loan in several capacities. It invested some of its own funds in the development. It also served as "Administrative Agent" of the refinancing under the Credit Agreement, for which it received a fee of $150,000. Credit Suisse Securities also received a $10.8 million fee for "arranging" the loan.

Events leading up to the execution of the Credit Agreement include the following, most of which are set out in the trial court's findings of fact, which Credit Suisse does not challenge.[3] In 2004, Credit Suisse arranged a $560 million recapitalization loan to borrowers developing the Lake Las Vegas (LLV) project, a residential neighborhood that included a golf course. Certain Highland-managed institutional funds invested in the 2004 loan. By 2006, the borrowers had

---

[2] Credit Suisse AG is the apex holding company of the Credit Suisse international bank. Its Cayman Islands Branch participated in this loan transaction. The branch location is not a separate legal entity, but "Credit Suisse AG, Cayman Islands Branch" is one of the two named defendants. The other named defendant is Credit Suisse Securities (USA) LLC ("Credit Suisse Securities"). Credit Suisse Securities participated in the loan transaction in various capacities. The two named defendants, petitioners to this appeal, are collectively referred to as "Credit Suisse."

[3] As stated in its brief, "[f]or purposes of appeal only, Credit Suisse accepts the trial court's findings of fact."

defaulted on financial covenants associated with the 2004 loan. The LLV borrowers engaged Credit Suisse to arrange a refinancing of the 2004 loan.

Pursuant to an engagement letter, Credit Suisse marketed the refinancing to lenders, including Claymore. In 2007, John Morgan of Claymore and David Miller of Credit Suisse communicated regarding Claymore's potential participation in the loan. Morgan stated that Claymore would only participate if Credit Suisse obtained an independent, as-is appraisal of the development that complied with the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA). According to the trial court's findings of fact, a FIRREA-compliant appraisal is considered the "gold standard" for appraisals of this sort. Among other requirements, FIRREA demands that an appraisal adhere to the Uniform Standards of Professional Appraisal Practice (USPAP). Credit Suisse agreed to provide such an appraisal and understood that Claymore's participation in the new loan was contingent on such an appraisal.

The Credit Agreement provided $540 million to the LLV borrowers, of which $250 million came from Claymore, the largest participant in the refinancing. The Credit Agreement required the borrowers to provide a "Qualified Appraisal" (Appraisal) to Credit Suisse. Credit Suisse participated heavily in the procurement of the Appraisal. Credit Suisse hired William Acton of CBRE, Inc. to prepare the Appraisal. CBRE initially sent a draft appraisal to Credit Suisse valuing the property at $748 million. The appraisal was based on several assumptions, including the "absorption period"—the period during which LLV would fully sell the whole development to homeowners—and view premiums, an assumption that properties with better views would sell for higher prices. Credit Suisse bankers knew the Appraisal was supposed to comply with FIRREA,

which required an independent and impartial appraisal that valued the property in its as-is condition, applying appropriate market-based deductions and discounts.

In April 2007, Acton sent Credit Suisse a new analysis that valued the property at $513.4 million. This estimate caused great concern at Credit Suisse because the value was below the amount of the anticipated loan. Credit Suisse would not have been able to market the loan unless the appraised value was higher, because a loan-to-value ratio of greater than 100% was not marketable. At the behest of Credit Suisse and the LLV borrowers, Acton increased the appraised value of the property through various methods that, according to Claymore, falsely inflated the true market value of the real estate. Claymore offered evidence that Credit Suisse knew the Appraisal was not FIRREA-compliant, was not impartial and unbiased, and overstated the true as-is market value of the collateral. Acton eventually prepared a final Appraisal, dated April 28 and circulated to Credit Suisse and potential investors in May, valuing the property between $511.6 million and $891 million. This dramatic increase in value occurred over a single weekend. In May 2007, Acton sent a draft of his final appraisal to Credit Suisse stating that the appraisal was not an "as-is" appraisal and therefore was not compliant with FIRREA. The trial court found that Credit Suisse knew the Appraisal contained material errors and did not state an independent, as-is market value consistent with FIRREA because it:

- Discounted cash flows to the wrong date;

- Used an improperly accelerated "absorption period";

- Improperly calculated view premium revenue;

- Included unsupported golf course revenue;

- Included unsupported investment income; and

6

- Had been prepared by an appraiser who did not act independently and who did not perform an actual appraisal.

Claymore offered testimony that it relied on the Appraisal in deciding to invest in the refinancing.

Credit Suisse participated in the transaction as the "Administrative Agent," among other designations.[4] The most pertinent provisions of the Credit Agreement are as follows. Under section 3.1(H)(vi), the obligation of each Lender, including Claymore, to make loans was subject to "conditions precedent," including the condition that the Administrative Agent "shall have received . . . from the Borrowers . . . a Qualified Appraisal . . . in a form reasonably acceptable to the Administrative Agent." Under section 1.1 of the Agreement:

> "Qualified Appraisal" means any real estate appraisal conducted in accordance with the Financial Institutions Reform Recovery and Enforcement Act ("FIRREA"), the Uniform Standards of Professional Appraisal Practice (as promulgated by the Appraisal Standards Board of the Appraisal Foundation) and all requirements of Applicable Law applicable to Administrative Agent undertaken by an Appraiser, and providing an assessment of the Appraised Value (Land Only) and the Appraised Value (All Collateral), the form and substance of such appraisal to be reviewed and approved by the Administrative Agent in its reasonable judgment.

Under section 2.3(B), "[u]pon satisfaction or waiver of the conditions precedent specified in Section 3.1, the Administrative Agent shall make the proceeds of [the loans] available to the Borrowers."

Claymore alleges Credit Suisse knew the Appraisal overvalued the property and was not an "as-is" appraisal that complied with FIRREA and USPAP. In response, Credit Suisse relies

---

[4] The agreements state that Credit Suisse, Cayman Islands Branch served as "Administrative Agent, Syndication Agent, Collateral Agent, as Fronting Bank and Paying Agent." Credit Suisse Securities (*see supra* note 2) served as "Sole Arranger and Sole Bookrunner." The trial court found that Credit Suisse Securities also served as Administrative Agent.

primarily on language in sections 8.3 and 8.8 that it contends absolves it of liability for the faulty

appraisal. Section 8.3 says:

> The Agents [e.g., Credit Suisse] shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. . . . Agents shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Section 3 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agents.

Section 8.8 says:

> Each Lender [e.g., Claymore] acknowledges that it has, independently and without reliance upon any Agent [e.g., Credit Suisse] . . . and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon . . . any Agent . . . and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.[5]

---

[5] In connection with the refinancing, Claymore agreed in a separate "Assignment and Assumption Agreement" that it had "received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision . . . ." Claymore also agreed that "it will, independently and without reliance on Administrative Agent . . . and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents . . . ." This disclaimer language is similar to the language of section 8.8 of the Credit Agreement and hence does not alter our analysis regarding the effect of the disclaimer language in the Credit Agreement on Claymore's fraud claim. Further, we read this language in the context of a separate agreement and as limiting reliance under that agreement, rather than overriding the provisions of the Credit Agreement in the event of a conflict under the two agreements.

Claymore claims the manipulated Appraisal induced it to invest in the deal. It blames all of its investment losses on Credit Suisse's manipulation of the Appraisal. The Appraisal is dated April 28, 2007. The Credit Agreement closed on June 22, 2007. The timing was perhaps unlucky in that a well-documented economic downturn followed shortly thereafter. The Las Vegas real estate market fared particularly poorly. By the end of 2007, Las Vegas had "the highest foreclosure rate in the country." Susan Milligan, *Mortgage Crisis Tarnishes Las Vegas Boomtown Image: Has Highest Foreclosure Rate in U.S.*, BOSTON GLOBE, Dec. 2, 2007, at A15.[6] The nearby town of Henderson, home to the Lake Las Vegas development, was similarly affected. *Id.* The LLV borrowers defaulted on the Credit Agreement in September 2007, just three months after closing on the Credit Agreement. They filed for bankruptcy in July 2008.

In addition to investing $250 million in the LLV refinancing under the Credit Agreement, Claymore also purchased additional LLV debt in the secondary market. It received some principal and interest payments on its loans, and it settled claims with the borrowers, CBRE, and another appraisal firm, but it ultimately lost most of its investment.

### B. Proceedings in the Trial Court and the Court of Appeals

Claymore sued Credit Suisse for fraudulent inducement, breach of contract, and several related claims. All the claims are based on the same alleged misconduct, Credit Suisse's manipulation of the Appraisal. In its breach of contract claim, Claymore alleged the Credit Agreement required Credit Suisse to deliver a "Qualified Appraisal," as defined by the Agreement, and Credit Suisse failed to do so by delivering a manipulated, non-FIRREA-compliant appraisal.

---

[6] At the jury trial, Claymore's appraisal expert agreed that the U.S. real estate market suffered a severe downturn during this period and that the decline in the Las Vegas market was particularly severe.

As for its fraudulent inducement claim, Claymore alleged Credit Suisse delivered an appraisal it knew was improperly manipulated while representing that the appraisal was FIRREA-compliant, which induced Claymore to participate in the transaction.

The fraudulent inducement claim was tried to a jury. The jury found Credit Suisse fraudulently induced Claymore to invest in the LLV refinancing through affirmative misrepresentation. The alleged misrepresentation was that the Appraisal was FIRREA-compliant. The jury declined to find that Credit Suisse fraudulently induced Claymore's investment by omitting to state a material fact. The damages question instructed the jury to measure "[t]he difference, if any, between what Plaintiff paid and the value of what Plaintiff received in the 2007 Lake Las Vegas Refinancing." The jury found damages of $40 million. It did not assess all of these damages to Credit Suisse. It assigned a total of 65% of the fault in causing Claymore's losses to the two Credit Suisse entities. It assigned the remainder of the fault to CBRE and the LLV developers/management.

The contract claim was later tried to the court,[7] as were claims for breach of the duty of good faith and fair dealing, aiding and abetting fraud, civil conspiracy, and unjust enrichment. The availability of "rescissory damages" (discussed below) under these causes of action and under the fraudulent inducement claim were also considered by the trial court.

The trial court made lengthy findings of fact and conclusions of law. It found that Credit Suisse breached the Credit Agreement by, among other things, "not reviewing or accepting the

---

[7] Section 9.18 of the Credit Agreement provided a waiver of jury trial in any proceeding arising out of the Agreement or other loan document. Claymore asked for a jury trial on all claims, while Credit Suisse argued that the Credit Agreement barred Claymore's right to a jury trial on all claims. The trial court concluded that Claymore's right to a jury trial on the fraudulent inducement claim was not barred by the Credit Agreement, a ruling that neither side contests.

form and substance of the Appraisal in its reasonable judgment and failing to confirm receipt of a Qualified Appraisal." It concluded that sections 8.3 and 8.8 of the Credit Agreement did not relieve Credit Suisse of liability for breach of contract or fraud. As noted, Credit Suisse does not challenge the trial court's findings of fact, arguing instead that Claymore's claims fail as a matter of law because of sections 8.3 and 8.8.

The trial court awarded Claymore rescissory damages—a form of equitable relief recognized under New York law, albeit in very rare instances—on the contract and fraudulent inducement claims as well as related claims of civil conspiracy, aiding and abetting fraud, and contractual breach of the duty of good faith and fair dealing. The court awarded an identical amount of rescissory damages on each of these claims. In explaining why it thought equitable rescissory damages were appropriate on the breach of contract claim, the court concluded:

> After weighing all the evidence and the equities, the Court finds that rescissory damages are appropriate because there is no measure available by which to estimate the value of [Credit Suisse's] promise to review and approve the Appraisal with reasonable certainty or precision. The difficulty in estimating the value of [Credit Suisse's] promise with reasonable certainty or precision has been caused by the conduct of Credit Suisse. Plaintiff has therefore been left without an adequate remedy at law.

The court similarly held that rescissory damages were available on the fraudulent inducement claim, concluding "there is no adequate remedy at law because Plaintiff's damages cannot be determined with reasonable certainly or precision." The judgment stated that the contract and tort claims all resulted in damages for the same amount, thus obviating the need for an election of remedies. It assessed rescissory damages of $211,863,998.56, "whether calculated as expectation damages, rescissory damages, or restitution." The trial court also awarded prejudgment interest of $75,644,154.22, court costs, and post-judgment interest.

11

The court of appeals affirmed. *Credit Suisse AG, Cayman Islands Branch v. Claymore Holdings, LLC*, 584 S.W.3d 18 (Tex. App.—Dallas 2018, pet. granted). The court rejected Credit Suisse's arguments that it did not breach the Credit Agreement, that the fraud claims were barred by contractual language disclaiming reliance, that key assumptions underlying the fraud claim were disclosed within the appraisal itself, and that the trial court erred in its award of damages. *Id.* at 27–42.[8]

## II. Analysis

The parties agree the case is governed by New York law because of a provision to that effect in the Credit Agreement.

### A. The Contract Claim

### 1. Liability

On the contract claim tried to the court, the parties dispute whether Credit Suisse breached the Credit Agreement by accepting a defective appraisal from the borrowers and passing it along to Claymore. To briefly summarize the parties' arguments, Credit Suisse leans primarily on section 8.3, which says the Agent is not responsible for statements and representations made in connection with the Agreement and is not responsible for the satisfaction of any conditions precedent, including the delivery of a FIRREA-compliant appraisal. Credit Suisse reads section 8.3 as only requiring it to confirm receipt of the Appraisal, not to vouch for its accuracy or compliance with FIRREA. Claymore responds that the general disclaimers in section 8.3 apply to

---

[8] The court of appeals also considered by cross-appeal whether the trial court erred in its award of prejudgment interest or by failing to award damages for unjust enrichment. The court found no error. *Id.* at 42–44. Claymore did not file a cross-petition in this Court.

obligations and duties "except those expressly set forth herein."  It argues Credit Suisse's duty to receive a Qualified Appraisal is "expressly set forth herein."  It further argues that the specific requirement in section 1.1 that Credit Suisse must exercise "reasonable judgment" in "review[ing] and approv[ing]" the "form and substance" of the Appraisal controls over the general disclaimer of reliance set out in section 8.8.

The court of appeals agreed with Claymore, concluding that section 8.3 did not preclude the contract claims.  *Credit Suisse*, 584 S.W.3d at 29.  We need not reach the contract construction arguments, however.  Under New York law, damages suffered by the plaintiff is an essential element of a claim for breach of contract, which the plaintiff must prove.  *Terwilliger v. Terwilliger*, 206 F.3d 240, 245–46 (2d Cir. 2000) (applying New York law).  Thus, if Claymore put on no evidence of legally cognizable contract damages, its breach of contract claim fails whether or not Credit Suisse breached the contract.  As explained below, we conclude that Claymore was not entitled to equitable relief on its contract claim.  Because Claymore did not pursue any proper measure of damages in the bench trial, it failed to carry its burden to establish damages flowing from Credit Suisse's alleged breach.  We therefore decide the contract claim in Credit Suisse's favor on damages without reaching contract liability.

### 2. Rescissory Damages for Breach of Contract

The trial court awarded equitable rescissory damages of $211,863,998.56 on Claymore's breach of contract claim.[9]  This relief amounted to a refund of Claymore's investment losses.  It

---

[9] The trial court also awarded an identical amount as to the claims for fraudulent inducement, breach of the implied duty of good faith and fair dealing, aiding and abetting fraud, and civil conspiracy.  Those claims are addressed in Parts II.B and II.C.

represents the amount of Claymore's investment minus settlement amounts previously received from non-parties and small amounts Claymore received in payments from the borrower before default.[10] The amount awarded by the court is more than five times the $40 million awarded by the jury, which was asked on the fraudulent inducement claim to measure damages by determining "[t]he difference, if any, between what Plaintiff paid and value of what Plaintiff received from the 2007 Lake Las Vegas Refinancing."

Under New York law, "rescissory damages" are "the economic equivalent of rescission in a circumstance in which rescission is warranted, but not practicable." *Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*, 935 N.Y.S.2d 858, 869–70 (N.Y. Sup. Ct. 2012). Claymore cites no New York appellate decision affirming an award of rescissory damages. It agrees, however, that rescissory damages are governed by the same principles governing the better-known equitable remedy of rescission. Rescission is a remedy whereby the court vitiates the contract between the parties and places them where they were before the contract was made. *Vitale v. Coyne Realty, Inc.*, 414 N.Y.S.2d 388, 393 (N.Y. App. Div. 1979) (per curiam). Rescission is not subject to "hard and fast" rules, and application of the remedy "usually depends on the circumstances of the particular case." *Callanan v. Powers*, 92 N.E. 747, 752 (N.Y. 1910). It is an equitable remedy and is not available where there is an adequate remedy at law. *See id.*; *Rudman v. Cowles Commc'ns, Inc.*, 280 N.E.2d 867, 874 (N.Y. 1972) (rescission is invoked "only when there is lacking [a] complete and adequate remedy at law"); *New Paradigm Software Corp. v. New Era of*

---

[10] The damage award also included relatively small adjustments reflecting a return of secondary market purchases Claymore made and prior receipt by Claymore of certain lender incentive fees. These amounts do not alter our analysis of the legal questions presented as to whether rescissory damages were properly awarded.

*Networks, Inc.*, 107 F. Supp. 2d 325, 329 (S.D.N.Y. 2000) (applying New York law) (stating that rescission is an equitable remedy and will not be granted unless the plaintiff lacks an adequate remedy at law). Rescission is an "extraordinary remedy" that "is appropriate only when a breach may be said to go to the root of the agreement between the parties." *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989) (applying New York law).

To begin with, the parties disagree on whether review of the trial court's equitable damages award is de novo or for abuse of discretion. While equitable relief is within trial-court discretion generally,[11] "the availability of a remedy under the facts alleged is a question of law." *City of Dallas v. Sanchez*, 494 S.W.3d 722, 724 (Tex. 2016) (per curiam). Whether an adequate legal remedy exists on a given set of facts is not itself a factual determination. It is either a question of law or an application-of-law-to-fact question. In either case, review is de novo. *See Colorado Cty. v. Staff*, 510 S.W.3d 435, 444 (Tex. 2017) (questions of law reviewed de novo); *In re State Farm Lloyds*, 520 S.W.3d 595, 604 (Tex. 2017) ("[W]ith regard to questions of law and mixed questions of law and fact, a trial court has no 'discretion' in determining what the law is or applying the law to the facts, even when the law is unsettled.") (internal quotation marks omitted).[12] Thus, while the nature and contours of an equitable award are within trial court discretion, the predicate legal question of whether an adequate remedy is available on a given set of facts should typically be reviewed de novo.

---

[11] *Wagner & Brown, Ltd v. Sheppard*, 282 S.W.3d 419, 428–29 (Tex. 2008).

[12] *See also Autonation Direct.com, Inc. v. Thomas A. Moorehead, Inc.*, 278 S.W.3d 470, 472 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding that in applying a contractual choice-of-law provision, Texas courts apply the substantive law of the choice-of-law provision and apply Texas law to matters of procedure, and that procedure includes standards of review).

The trial court found that rescissory damages were appropriate on the contract claim because there was "no measure available by which to estimate the value of [Credit Suisse's] promise to review and approve the Appraisal with reasonable certainty or precision," leaving Claymore "without an adequate remedy at law." The court of appeals agreed with the trial court "that damages could not be determined with reasonable certainty." *Credit Suisse*, 584 S.W.3d at 38.

We disagree. An adequate remedy at law existed, as evidenced most vividly by the damages case Claymore itself put before the jury. Rescissory damages were therefore unavailable. As we understand New York law, equitable relief is not available merely because the plaintiff faces difficulty in proving damages. The correct standard is closer to impossibility, not difficulty. *See Rudman*, 280 N.E.2d at 874 (rescission is available "*only when*" an adequate remedy at law is "*lacking*") (emphasis added). When Claymore argued to the trial court that legal damages could not be calculated, it had just finished a jury trial in which it put on a case for $172 million in legal damages for the same injury. It had agreed to ask the jury a question similar to the question it later told the trial court could not be calculated—the difference between what it paid and the value of what it received. This measure would have been a reasonable way to begin to properly measure Claymore's legal damages under the conventional "benefit-of-the-bargain" measure. *See, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 221 (S.D.N.Y. 2019) (explaining that ordinary measure of contract damages is the benefit of the bargain, "a species of expectation damages," that places the plaintiff in the same position as if the contract had been performed); *Sager v. Friedman*, 1 N.E.2d 971, 974 (N.Y. 1936) ("The measure of damages which flows from a breach of contract is the difference between the value of what has been received under the

contract and the value of what would have been received if the contract had been performed according to its terms.").

Credit Suisse's failure to deliver an accurate appraisal meant Claymore held an under-collateralized loan that was less valuable than the loan it bargained for. The proper measure of the legal damages flowing from Credit Suisse's breach was the difference in value between the position Claymore held immediately upon closing and the position it would have held on that same day if the collateral had been worth as much as the Appraisal promised. *See, e.g.*, *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007) (applying New York law) (holding in suit for breach of contract for sale of company that the "benefit of [the] bargain [is] measured as the difference between the value of [the company] as warranted by [seller] and its true value at the time of the transaction."). It bears emphasis that Claymore received for its money a valuable asset—a collateralized loan—though not as valuable as the Appraisal indicated. The proper measure of legal damages does not treat Claymore as if it got nothing of value for its money. Under New York law, benefit-of-the-bargain or expectation damages do not entitle Claymore to the difference between what it invested and the return it received on that investment *down the road*. Instead, the proper measure is the difference between what Claymore bargained for and what it got *at the time of the transaction*. *Id.*; *Astoria Caterers, Inc. v. J & P 1870 Realty Corp.*, 806 N.Y.S.2d 242, 244 (N.Y. App. Div. 2005) (holding in suit for breach of contract to convey real estate that benefit-of-bargain damages would be "the difference between the contract price and the market value at the time of the breach").

Claymore contends, and the trial court agreed, that there is actually no way to calculate that difference in value. But the jury had no problem making a similar calculation. It found that the

17

difference "between what Plaintiff paid and the value of what Plaintiff received in the 2007 Lake Las Vegas Financing" was $40 million. And it did so based on Claymore's own evidence and arguments. At the jury trial, Claymore established its damages through expert witnesses, documents, and jury argument. It claimed damages as the difference between what it paid at the LLV refinancing and the value of what it received at the time of the transaction, a measure tracked in the jury charge. Claymore used its $250 million share of the refinancing as the measure of what it paid. To measure the value of what it received, it looked to the sum it claimed Claymore would receive on its share of the collateral if the loan failed and ended up in bankruptcy court, based on the true value of the land and what it would fetch in foreclosure. This land value was allegedly the value of the land at the time the loan closed, but with a downward adjustment reflecting fees and a discount for distressed asset sales typically occurring in a bankruptcy liquidation. One expert, Stephen Roach, purported to determine the fair market value of the collateral in a "retrospective appraisal." He reviewed CBRE appraisal documents and made what he thought were appropriate corrections and adjustments. For example, Roach did not agree with the Appraisal's treatment of view premiums, golf course revenues, the absorption period, and the method of discounting future cash flows, and adjusted the value accordingly. Another expert, Brian Vahey, testified about the appropriate discount for distressed asset sales in bankruptcy. He opined that certain property features such as view premiums would not yield any additional value to a property liquidated in a bankruptcy proceeding. Claymore used this value its experts had calculated as the value of the collateral. It then added some relatively small amounts for Claymore's share of principal, interest, and fees that were paid or assignable to Claymore to arrive

18

at a value of what it received in the refinancing. It claimed damages of $172 million as the difference between what it paid and the value of what it received.

This may not have been a perfect method of calculating "the value of what [Claymore] received in the 2007 Lake Las Vegas financing," but it was the method Claymore itself chose. New York law prohibits resort to equity if damages can be calculated with *reasonable* certainty. *See Van Wagner Advert. Corp. v. S&M Enters.*, 492 N.E.2d 756, 760–61 (N.Y. 1986) (denying specific performance unless damages are "conjectural" and "cannot be calculated with reasonable certainty"). The calculation need not be perfect or free from doubt. Measuring benefit-of-the-bargain damages often entails looking back to the time of the transaction and reconstructing an asset's hypothetical value at a particular point in the past. *E.g.*, *Sharma v. Skaarup Ship Mgmt. Co.*, 916 F.2d 820, 825–26 (2d Cir. 1990) (applying New York law) (noting "fundamental proposition of contract law" that damages are "determined as of the time of the breach," and therefore damages for breach of contract to sell vessels must be based on the value of the vessels on the date of the breach). In a complex case like this one, any such endeavor may involve some degree of estimation and may require a good deal of sophisticated expert testimony. But the difficulty or complexity of the proof required does not render the entire enterprise merely conjectural.

In any event, "the value of what Plaintiff received in the 2007 Lake Las Vegas Financing" would have been the relevant inquiry when calculating benefit-of-the-bargain contract damages in this case. That value is precisely what Claymore asked the jury to calculate. And it is what Claymore later told the trial court could not be calculated at all. Claymore's position now is that the trial court had discretion to disregard the jury's answer to that question, decide the number

19

could not be calculated, and then award an alternative dollar figure that manifestly comes nowhere close to approximating what properly calculated legal damages would have been. Claymore cites no case where such an outcome was upheld, and we find no justification in New York law for it. To the contrary, New York courts addressing arguments similar to Claymore's have rejected them. *E.g.*, *Barkley v. United Homes, LLC*, 848 F. Supp. 2d 248, 277 (E.D.N.Y. 2012) (applying New York law) ("[A plaintiff] cannot present evidence of . . . damages to the jury and request a monetary award based on such evidence, receive such award, and then claim that the mere possibility that the jury did not award damages fully compensating [it] for these losses warrants the extraordinary remedy of rescission."), *aff'd*, 557 F. App'x 22 (2d Cir. 2014) (unpublished).

Claymore argues the jury's finding on fraud damages is irrelevant to contract damages. It emphasizes distinctions between the legal theories underlying fraud damages and contract damages.[13] It is true that fraud damages and contract damages are in some cases measured differently. But there is no question that "the value of what Plaintiff received in the 2007 Lake Las Vegas Financing" is the key question in this case for purposes of calculating contract damages. Claymore argued it was also the key question for purposes of calculating fraud damages in this case. And it does not challenge the jury's damages finding. When the question of an asset's past value has already been proven to a jury under a damages model neither party challenges, any

---

[13] As authority for the distinctions New York courts draw between contract and fraud damages, Claymore cites *Merrill Lynch*, 500 F.3d at 183 (stating "well-established common law rule that fraud damages represent the difference between the purchase price of the asset and its true value, plus interest, generally measured as of the date of sale"); *Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs.*, 692 N.E.2d 551, 553 (N.Y. 1998) (stating that contract damages "are intended to place the injured party in the same position as if there had been no breach"); *Sager*, 1 N.E.2d at 974 (discussing "vital distinction" between damages for contractual breach of warranty and fraud damages); and *Cayuga Harvester, Inc. v. Allis-Chalmers Corp.*, 465 N.Y.S.2d 606, 618 (N.Y. App. Div. 1983) (stating that party suing for breach of contract "is entitled to the benefit of [the] bargain as written and is entitled to damages for the loss caused by failure to perform the stipulated bargain").

suggestion that it was really *never possible* to calculate that value faces a strong headwind. Claymore points to no case in which a New York court has blessed such a recovery.

Claymore argues we should ignore altogether the jury's damages finding because the trial was bifurcated. According to Claymore, it could argue any damages theory it chose to the trial court, and anything it said in the jury trial about damages was irrelevant to the bench trial. True, the trial was bifurcated. But the trial court concluded in its judgment that every claim on which Claymore recovered "caused the same amount of damages." In other words, there was only one injury to redress, as Claymore itself argued.[14] Either that injury could be adequately redressed without resort to equitable relief, or it could not. In this Court, Claymore argues that fraud and contract claims are "*different* claims that redress *different* legal injuries under *different* measures of damages," but the trial court treated them exactly the same, awarding an identical amount for both, and Claymore defends that outcome. Claymore cites no authority from New York law under which it can leave its favorable $40 million jury verdict for legal damages in place as a backup and then seek a second bite at the apple in equity under the theory that one of the calculations it asked the jury to make cannot really be calculated at all. Again, Claymore "cannot present evidence of . . . damages to the jury and request a monetary award based on such evidence, receive such award, and then claim that the mere possibility that the jury did not award damages fully compensating [it] for these losses warrants the extraordinary remedy of rescission." *Id.* This sensible rule does not vanish altogether merely because trial is bifurcated.

---

[14] In a pretrial hearing before the jury trial, Claymore argued to the trial court that its various claims stated injury "several different ways," but that damages including rescissory damages are "all the same thing." In its closing statement in the bench trial, Claymore asked for contract damages measured by "what did we invest minus whatever we received." It argued that expectation, rescissory, and restitution damages all "end up being the same."

Claymore further relies on the familiar notion that an injured plaintiff may elect its remedy. *E.g.*, *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988). Claymore essentially contends that it is entitled to an election as between the $40 million awarded by the jury for fraud and the $211 million awarded by the court. It is correct that a plaintiff in Claymore's position may elect its remedy as between fraud and breach of contract, if he secures favorable findings under both theories of recovery. *E.g.*, *id.* ("When a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief."). But the power to elect a remedy as between multiple legal theories is not the power to elect a recovery as between law and equity. Equitable relief is available *only* if legal damages cannot be calculated. *E.g.*, *Van Wagner Advert. Corp.*, 492 N.E.2d at 760–61; *Joneil Fifth Ave. Ltd. v. Ebeling & Reuss Co.*, 458 F. Supp. 1197, 1201 (S.D.N.Y 1978) (applying New York law). Claymore cannot "elect" an equitable remedy without demonstrating both the inadequacy of any alternative and the appropriateness of the equitable relief it seeks. *Rudman v. Cowles Commc'ns, Inc.*, 280 N.E.2d 867, 874 (N.Y. 1972); *Callanan v. Powers*, 92 N.E. 747, 752 (N.Y. 1910). It has done neither.

For those reasons, we conclude that a legal damages remedy was available, foreclosing equitable relief. The trial court, however, described its $211 million award in kitchen-sink fashion, characterizing it as equitable rescissory damages, expectation damages, restitution, and benefit-of-the-bargain damages. Claymore, too, attempts to sidestep the question of its entitlement to equitable relief by arguing that the damages awarded were really traditional expectation or benefit-of-the-bargain contract damages. This position conflicts with the trial court's explicit finding that legal damages could not be calculated, a finding Claymore does not challenge. By calling its award

22

rescissory damages, expectation damages, benefit-of-the-bargain damages, and restitution, the trial court invoked mutually exclusive theories of recovery. Looking at the findings and conclusions as a whole, it is clear the trial court found that legal damages could not be calculated and so awarded equitable relief, not legal damages under an expectation or benefit-of-the-bargain measure. But even if the "expectation" label is taken seriously, this award cannot be upheld. As explained above, expectation damages would have to deduct the fair market value of the asset Claymore received at the time of breach. *See Emposimato v. CICF Acquisition Corp.*, 932 N.Y.S.2d 33, 36 (N.Y. App. Div. 2011) (explaining that calculation of expectation damages calls for deduction of the fair market value of what the plaintiff received at the time of the breach). Claymore never established that the collateral was worthless *at the time of breach*. Instead, it asked the jury to calculate "the value of what Plaintiff received in the 2007 Lake Las Vegas Financing," and its witnesses told the jury this value was many tens of millions of dollars. By its own admission, even with the faulty appraisal, Claymore still held a valuable asset backed by substantial collateral on the day the transaction closed. The trial court's award, however, allowed Claymore to keep what it got in the transaction *and* get its money back. That is not how expectation or benefit-of-the-bargain damages work. Instead, these traditional measures of contract damage are "determined as of the time of the breach," and "New York courts have thus explicitly . . . rejected awards based on what the actual economic conditions and performance were in light of hindsight." *Sharma*, 916 F.2d at 825–26 (internal quotation marks omitted); *accord White v. Farrell*, 987 N.E.2d 244, 252 (N.Y. 2013).

The near-complete loss of Claymore's investment could conceivably be characterized as indirect, consequential damages resulting from the defective appraisal, under the theory that the

23

appraisal was a but-for cause of the loan. Indeed, Claymore seems to argue that the reason Credit Suisse should pay for all Claymore's investment losses is because Claymore would not have made the loan at all but for Credit Suisse's wrongdoing. This approach amounts to the assertion of consequential damages, though Claymore does not defend its award under that banner. Consequential damages are indirect damages that "seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000) (applying New York law). New York law recognizes consequential damages resulting from breach of contract. *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 130 (N.Y. 2008). But such damages must be reasonably foreseeable. *Id.*; *Kenford Co. v. County of Erie*, 537 N.E.2d 176, 178 (N.Y. 1989) (consequential damages "must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting"). Claymore did not attempt to establish that the rapid devaluation of the Lake Las Vegas project during the housing crash was "within the contemplation" of Credit Suisse at the time of contracting. Nor could it. Credit Suisse itself invested many millions in the deal. It obviously did not foresee the project's failure or the market collapse.

The bottom line is that Claymore asked the jury to calculate damages based on "the value of what Plaintiff received in the 2007 Lake Las Vegas Financing." The jury did so, and it awarded $40 million. Perhaps one reason the jury awarded far less than Claymore requested was the jury's skepticism that Credit Suisse should be held responsible for later events that neither side

anticipated.[15] In the face of a jury verdict, solicited by Claymore, on the very asset-valuation question needed to calculate contract damages, the trial court was not authorized to award Claymore five times the jury award under the theory that the value Claymore itself asked the jury to calculate was actually incalculable.

For these reasons, we hold that the contract-damage award of $211,863,998.56 by the trial court after the bench trial cannot stand. Because Claymore failed to present any evidence of legally cognizable contract damages in the bench trial, an essential element of its breach of contract claim is lacking. We therefore render judgment for Credit Suisse on that claim.

## B. Fraudulent Inducement Claim

### 1. Liability

Credit Suisse argues that the fraudulent inducement claim fails as a matter of law because of disclaimers of reliance in the Credit Agreement. Credit Suisse does not challenge the jury's finding that Credit Suisse made material misrepresentations or the jury's calculation of damages for fraud. Instead, it argues that Claymore's reliance on its misstatements was unreasonable as a matter of law because of the disclaimers in section 8.8 of the Credit Agreement, quoted above.

Under New York law, a plaintiff must prove its justifiable reliance on fraudulent misrepresentations by clear and convincing evidence. *Simcuski v. Saeli*, 377 N.E.2d 713, 719

---

[15] Credit Suisse in fact argued to the jury that Claymore's losses were due to market events rather than the faulty Appraisal:

> Now, we know that this was a results-driven thing because [Plaintiff's expert] ignored the impact of the economy entirely in his analysis. He claims that 100 percent of the losses were caused by the CBRE appraisal even though we know the economy and the real estate market collapsed right after the loan. And we know it because [Plaintiff's expert] told us this yesterday. . . . By failing to account for the economy at all, Plaintiff has failed to prove by clear and convincing evidence what the appropriate damages number would be.

(N.Y. 1978). "[W]here a party specifically disclaims reliance upon a representation in a contract, that party cannot, in a subsequent action for fraud, assert it was fraudulently induced to enter into the contract by the very representation it has disclaimed." *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 734 (2d Cir. 1984) (applying New York law). Often, comprehensive disclaimers executed by sophisticated parties are sufficient to insulate them from tort liability. *E.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Citigroup Glob. Mkts. Inc.*, 987 N.Y.S.2d 299, 300 (N.Y. App. Div. 2014). But there are limits to this rule. *Id.* New York law is "abundantly clear" that a plaintiff's contractual disclaimer of reliance on the defendant's misrepresentations or omissions is ineffective unless: (1) the disclaimer is made sufficiently specific to the particular type of fact misrepresented, and (2) the alleged misrepresentation did not concern facts peculiarly within the defendant's knowledge. *Id.* at 304; *Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*, 980 N.Y.S.2d 21, 28 (N.Y. App. Div. 2014). Claymore argues, and the court of appeals held, that the disclaimers were not specific to the appraisal, and the misrepresented facts were peculiarly within Credit Suisse's knowledge. *Credit Suisse*, 584 S.W.3d at 32–35. If either proposition is true, the contractual disclaimers are ineffective. We do not address the specificity requirement, because we conclude as a matter of New York law that Claymore carried its burden to establish Credit Suisse's "peculiar knowledge" of the misrepresented facts.

With some instructions omitted, the first three jury questions stated:

**QUESTION NO. 1:**

In answering this question, you must apply the following instructions:

To prove fraudulent inducement by affirmative representation, Plaintiff must prove each of the following elements by clear and convincing evidence:

(1) A defendant made a material representation that was false;

26

(2) with knowledge of its falsity or recklessly without any knowledge of the truth;
(3) Defendant made the misrepresentation with the intention that it should be acted on by Plaintiff;
(4) Plaintiff justifiably relied on the misrepresentation; and
(5) Plaintiff suffered injury as a result.

Did Defendant Credit Suisse AG, Cayman Island Branch fraudulently induce Plaintiff to participate in the 2007 Lake Las Vegas Refinancing by making affirmative misrepresentations?

> Answer "Yes or "No".
> Answer: <u>Yes</u>

Did Defendant Credit Suisse Securities (USA) LLC fraudulently induce Plaintiff to participate in the 2007 Lake Las Vegas Refinancing by making affirmative misrepresentations?

> Answer "Yes" or "No".
> Answer: <u>Yes</u>

## QUESTION NO. 2:

In answering this question, you must apply the following instructions:

To prove that Defendants had superior knowledge of material facts, Plaintiff must demonstrate by clear and convincing evidence that: (i) material facts were peculiarly within that Defendant's possession and (ii) Plaintiff could not have discovered those material facts through the exercise of ordinary intelligence or reasonable diligence.

Did Defendant Credit Suisse AG, Cayman Islands Branch have superior knowledge of material facts?

> Answer "Yes" or "No".
> Answer: <u>Yes</u>

Did Defendant Credit Suisse Securities (USA) LLC have superior knowledge of material facts?

> Answer "Yes" or "No".
> Answer: <u>Yes</u>

If you answered "yes" to either Defendant in response to Question No. 2, then answer Question No. 3 for that Defendant. If you answered "no" as to both Defendants in response to Question No. 2, then do not answer Question No. 3 and move on to Question No. 4

**QUESTION NO. 3:**

Did Defendant Credit Suisse AG, Cayman Islands Branch fraudulently induce Plaintiff to participate in the 2007 Lake Las Vegas Refinancing by omitting to state a material fact?

> Answer "Yes" or "No".
> Answer: <u>No</u>

Did Defendant Credit Suisse Securities (USA) LLC fraudulently induce Plaintiff to participate in the 2007 Lake Las Vegas Refinancing by omitting to state a material fact?

> Answer "Yes" or "No".
> Answer: <u>No</u>

Credit Suisse argues that the "peculiar knowledge" inquiry involved a fact question on which Claymore was required to obtain a jury finding. Even if that is true, Claymore obtained an adequate finding. Question 2 posed to the jury asked whether Credit Suisse had "superior knowledge of the material facts." The jury answered yes. Credit Suisse argues this question was only relevant to the fraud-by-omission theory of liability in Question 3, which the jury rejected. However, Question 2 merely asks in general whether Credit Suisse had superior knowledge of material facts. Question 2 was not tied only to the fraud-by-omission claim. It is true that Question 3, concerning fraud by omission, was to be answered only if the jury answered Question 2 in the affirmative. But this does not change the fact that Question 2 asks the pertinent question, without any caveat or reference to other questions. There was also a general instruction, applicable to Questions 1 and 3, which explained that justifiable reliance depends on several factors. Among these factors, the general instruction stated: "You are instructed that 'justifiable reliance,' as used

28

in Question Nos. 1 and 3 means that Plaintiff must prove that Plaintiff justifiably relied on the alleged misrepresentation or omission. . . . Whether the person to whom a representation was made is justified in relying upon it generally depends upon . . . whether the facts that were misrepresented or concealed were peculiarly within the other party's knowledge." Thus, the jury was instructed to consider Credit Suisse's peculiar knowledge under Questions 1 and 2, and it was made aware of the potential interplay between those questions. These questions adequately presented the peculiar-knowledge issue to the jury, and the jury answered both questions in Claymore's favor.

Credit Suisse contends that Claymore needed to specifically ask the jury whether Credit Suisse had peculiar knowledge of the particular fact the jury found was misrepresented in Question 1. In this instance, we do not understand the law to require that degree of specificity in the jury questions. The evidence abundantly supports the jury's finding that Credit Suisse possessed superior knowledge of whether the appraisal complied with FIRREA and why it did not. This is the fact within Credit Suisse's peculiar knowledge on which Claymore relies in its defense to the contractual disclaimers. Credit Suisse provides no reason to doubt that this is also one of the facts the jury found to be within its special knowledge. Under the jury charge quoted immediately above, the only representations that were of concern to the jury were those that were allegedly false and on which Claymore justifiably relied. And in deciding justifiable reliance, the jury was required to consider whether the misrepresentation was peculiarly within Credit Suisse's knowledge. "We must assume that the jury followed the trial court's instructions and answered the question put to them." *Phillips v. Phillips*, 820 S.W.2d 785, 787 n.2 (Tex. 1991).

Credit Suisse further argues that the relevant facts regarding the Appraisal's failure to conform with FIRREA and USPAP were not peculiarly within its knowledge because the failure was apparent from the Appraisal itself. For example, Credit Suisse argues that the alleged improper date for discounting cash flow is stated in the Appraisal. A New York court has already rejected this argument in a similar circumstance where lenders with under-collateralized loans sued Credit Suisse. *Allenby, LLC v. Credit Suisse, AG, Cayman Islands Branch*, No. 652491/2013, 2015 WL 1442370 (N.Y. Sup. Ct. March 3, 2015), *aff'd*, 25 N.Y.S.3d 1 (N.Y. App. Div. 2015). As here, the lenders relied on a "Qualified Appraisal," "the form and substance of" which was "to be reviewed and approved by the Administrative Agent in its reasonable judgment." 2015 WL 1442370, at *3. Credit Suisse argued that the assumptions underlying the appraisal were disclosed and therefore the lenders failed to conduct a reasonable investigation. Among its reasons for rejecting this argument, the appellate court reasoned:

> Defendants contend that plaintiffs failed to conduct any investigation. However, the contracts at issue implied that the appraisers (both of which were well known firms) would be independent, and said that the appraisals would be conducted in accordance with the Uniform Standards of Professional Appraisal Practice. Where a plaintiff has taken reasonable steps to protect itself against deception, it should not be denied recovery merely because hindsight suggests that it might have been possible to detect the fraud when it occurred.

25 N.Y.S.3d at 5 (ellipsis, internal quotation marks omitted).

New York courts would likely view this case similarly. The fact that certain irregularities might have been gleaned from a close examination of the 200-page Appraisal and its supporting documentation does not eviscerate the jury's finding that Credit Suisse had superior knowledge of the material facts. The central failure of the Appraisal was that it did not provide an independent, objective, as-is fair market value as required by FIRREA. The falsity of Credit Suisse's

misrepresentation to the contrary was not apparent from the document itself.  The intentional misstatement of compliance with FIRREA and the attendant overstatement of the fair market value of the collateral was not discoverable to Claymore "by the exercise of ordinary intelligence." *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 931 N.E.2d 87, 91 (N.Y. 2010).  In sum, given the jury finding of its superior knowledge, Credit Suisse cannot rely on the contractual disclaimers to defeat liability for fraudulent inducement.  *Loreley Fin. (Jersey) No. 3 Ltd.*, 987 N.Y.S.2d at 300; *Basis Yield Alpha Fund (Master)*, 980 N.Y.S.2d at 28.

## 2. Rescissory Damages for Fraud

The trial court awarded rescissory damages of over $211 million for fraudulent inducement.  It held that rescissory damages were available on this claim, on which the jury had already awarded damages of $40 million, because Claymore's fraud damages "cannot be determined with reasonable certainty or precision."  As discussed above, Claymore argued to the jury and offered evidence of legal damages for fraud, measured by the difference between what it paid and what it received in the 2007 LLV refinancing.  Rescissory damages are only available where damages cannot be measured.  *Van Wagner Advert. Corp. v. S&M Enters.*, 492 N.E.2d 756, 760–61 (N.Y. 1986); *Joneil Fifth Ave. Ltd. v. Ebeling & Reuss Co.*, 458 F. Supp. 1197, 1201 (S.D.N.Y 1978) (applying New York law).  Again, the fact that the jury did not reward all the damages Claymore sought does not establish that no adequate measure of damages exists or that Claymore is entitled to a second bite at the apple.  Neither side contends that the measure of damages for fraudulent inducement provided in the jury charge is legally wrong or factually unsupported.  The trial court's resort to equitable relief was error.

31

Moreover, damages for fraudulent inducement must be reasonably foreseeable. *D.S. Magazines, Inc. v. Warner Publisher Servs. Inc.*, 640 F. Supp. 1194, 1210 (S.D.N.Y. 1986) (applying New York law) (plaintiff seeking recovery for fraudulent inducement must prove by clear and convincing evidence that "damages were incurred as a direct or reasonably foreseeable result of the misrepresentations"). As with contract damages, damages for fraudulent inducement ordinarily equal the difference of what the plaintiff paid and what he received at the time of the investment; subsequent events are irrelevant. *See, e.g.*, *Cont'l Cas. Co. v. PricewaterhouseCoopers, LLP*, 933 N.E.2d 738, 742 (N.Y. 2010) (explaining general rule that damages for fraudulent inducement consist of "the actual pecuniary loss sustained as a direct result of fraud" measured by "the difference between the amount paid and the value of the article received," and measured "on the day of [plaintiffs'] respective investments"); *id.* at 744 (Read, J., dissenting) (agreeing with majority that "the proper measure of damages in this case for fraudulent inducement, if proven, would be the difference between what plaintiffs paid for their partnership interest when they invested and the value of what they received at that time in exchange"); *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007) (applying New York law) (stating that fraud damages "represent the difference between the purchase price of the asset and its true value . . . generally measured as of the date of the sale"). The trial court's award of $211 million for fraud followed none of these well-established approaches to damages. Instead, it substituted an amount that was five times the jury's verdict and that bears no relationship to properly measured fraud damages. For these reasons, the trial court's award of $211 million as damages for fraudulent inducement cannot stand.

## C.  Other Claims

In addition to fraudulent inducement and breach of contract, Claymore alleged breach of the implied duty of good faith and fair dealing, aiding and abetting fraud, and civil conspiracy. The trial court awarded an identical $211 million in "rescissory damages" under each of these causes of action.  We render judgment against Claymore on these claims.

The claim for breach of the implied duty of good faith and fair dealing is not cognizable under New York law when it is asserted with a breach of contract claim that arises from the same facts and the plaintiff seeks identical damages.  *See Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 894 N.Y.S.2d 47, 49–50 (N.Y. App. Div. 2010) (holding that breach of implied covenant of good faith and fair dealing is properly dismissed when breach of contract claim and implied covenant claim arise from the same facts and seek identical damages); *Allenby, LLC*, 25 N.Y.S.3d at 4 (same); *19 Recordings, Ltd. v. Sony Music Entm't*, 97 F. Supp. 3d 433, 438–39 (S.D.N.Y. 2015) (applying New York law) (same).[16]  Claymore did not claim different damages under its duplicative good faith and fair dealing contract claim.  It claimed that damages under its various claims were all the same.[17]  As noted, the trial court in its judgment expressly concluded that all of the alleged claims "caused the same amount of damages."  Its conclusions of law likewise found identical damages under the contract and contractual good faith and fair dealing claim.  Claymore made no argument that the trial court erred in these holdings.

---

[16] The court of appeals concluded that the trial court should have dismissed the claim for breach of the implied duty of good faith and fair dealing but that the error was harmless.  *Credit Suisse*, 584 S.W.3d at 30 n.3.

[17] *See supra* note 14.

The claim for aiding abetting fraud fails for a similar reason. Under New York law, the claim is properly dismissed if it is duplicative of another claim and does not allege distinct damages. *Antonelli v. Guastamacchia*, 17 N.Y.S.3d 436, 438 (N.Y. App. Div. 2015) (dismissing claim of aiding and abetting fraud because it was duplicative of another claim and did not allege distinct damages). Claymore claimed and the trial court found that the damages for fraudulent inducement and aiding and abetting fraud were identical. Claymore has never argued otherwise. And again, even if a separate aiding and abetting tort were available under New York law, Claymore makes no persuasive argument that the legal barriers to an award of rescissory damages, discussed at length above in Part II.B.2, would not apply with equal force to both claims.

Likewise, rendition is warranted on the civil conspiracy claim. Claymore alleged that Credit Suisse conspired with the borrowers and appraisers to defraud Claymore. Our understanding of New York law is that such a claim may be used to bring in additional defendants, but it is not available against a defendant against whom a direct fraud claim is alleged. *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 503 N.E.2d 102, 103 (N.Y. 1986) (mem. op.) (explaining there is no separate tort of conspiracy under New York law, but that allegations of conspiracy are permitted "to connect the actions of separate defendants with an otherwise actionable tort"); *Am. Baptist Churches of Metro. N.Y. v. Galloway*, 710 N.Y.S.2d 12, 18 (N.Y. App. Div. 2000) (same). And again, even if a conspiracy claim against Credit Suisse were available under New York law, Claymore makes no persuasive argument that the legal barriers to an award of rescissory damages would not apply with equal force to this claim.

### III. Conclusion and Disposition

For the foregoing reasons, the fraud damages of $40 million awarded by the jury should stand, subject to a reduction for allocation of fault, but the rescissory damages for fraud and breach of contract awarded after the bench trial were not available to Claymore in this case. We render judgment against Claymore on the contract claim. Likewise, rescissory damages under other theories of liability were not available, and we render judgment against Claymore on the claims for breach of the implied duty of good faith and fair dealing, aiding and abetting fraud, and civil conspiracy. The court of appeals' judgment is affirmed in part and reversed in part, and the case is remanded to the trial court for entry of judgment consistent with this opinion.[18]

_____
James D. Blacklock
Justice

**OPINION DELIVERED:** April 24, 2020

---

[18] We do not render judgment on the fraud claim based on the jury verdict because there may be certain matters still in dispute that were not briefed to the Court. For example, from our review of the record and briefing, there may be questions about the availability and amount of prejudgment interest on this claim, the treatment of settlement credits in relation to the jury's allocation of fault, and damages for secondary market purchases. We express no view of these questions and leave them to the trial court to consider and resolve if necessary.